## Polando, Appellant, *v.* Blue Ridge Transportation Company.

Argued May 28, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

486

Appeal, No. 41,

reargument re-
fused July 21, 1953.

*Wade K. Newell,* for appellant.

*Henry R. Beeson,* with him *Higbee, Lewellyn &
Beeson,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 26, 1953:
Edith Polando, 33 years of age, single, living in
Waltersburg, Fayette County, was employed as a wait-
ress in Elks Park, Henry Clay Township, also in Fay-
ette County. She worked every day but Monday. On
the afternoon of Monday, March 25, 1946, she visited
Uniontown, six miles distant from her home, to shop
with her sister Mary Polando and to call on a friend,
Mrs. Corrado. At the end the day, Mrs. Corrado ac-
companied her to the West Penn Bus Terminal where
she was to take the 9:40 p.m. bus for her home. The
bus, however, was late and did not arrive until 10:20.
She boarded it and occupied the first seat, across the
aisle from the bus driver, Eddie Eakle, with whom she
had a speaking and friendly acquaintance.

Because of his tardy arrival at the terminal, Eakle
tarried only 5, instead of the usual 15 minutes, and
upon leaving the terminal immediately went into high
speed, explaining to Miss Polando that he had "to make
up time." It was a clear night and the weather dry
as the bus, now travelling northwardly on Route 51,

approached the Vance Mills Road which crosses this Uniontown-Pittsburgh highway. Within some 500 feet of the intersection the bus swung to the left to pass an automobile travelling in the same direction. While the bus was still on the southbound side of the highway, two cars approached from the opposite direction, one seeking to pass the other. The overtaking car (which later turned out to be a Ford) was travelling on *its* left side of the highway and was moving across to the southbound lane to get back to its right side of the road. At the same time the bus driver was trying to get over to the northbound lane. Since both vehicles were endeavoring to reach their respective proper lanes over the same path of travel, the resulting head-on collision was inevitable. Of the occupants of the Ford car one was killed and several others injured. In the encounter the bus lost its left front wheel, its front axle was bent and it suffered other damages. Its momentum, however, was such that it continued to travel forward until it finally crashed against an embankment some 680 feet beyond the first collision.

Edith Polando in the front seat was twice thrown with violence against the front of the bus, the windshield and to the floor; once at the time of the collision with the Ford and the second time when the bus hit the embankment. She brought suit against the bus company for injuries sustained in the double crash, and at the trial which took place in April, 1949, the jury awarded her a verdict of $25,000. The defendant moved for a new trial and while the motion was pending, the plaintiff died on August 13, 1950.

After Edith Polando's death, an autopsy was performed and the cause of death was said to be "hypernephroma or renal tubular adenocarcinoma, with multiple metastases throughout both kidneys, both adrenal

glands, the left upper pulmonary lobe, and the cerebrum; complicated by an acute lobar pneumonia in the left upper pulmonary lobe," summed up in the proceedings below as cancer. On this finding a new trial was ordered and Mary Polando, sister of the decedent, and executrix of the estate, was substituted as plaintiff.

At the second trial where the testimony of the deceased Edith Polando was read to the jury, the trial judge instructed the jury that if they found for the plaintiff they could only award damages in the sum of 6¼¢. The jury returned such a verdict. The plaintiff moved for a new trial which was refused. The defendant moved for judgment n.o.v. which was granted, and the plaintiff has appealed.

A review of the long record which (with two trials) embraces some one thousand typewritten pages, establishes that the judgment n.o.v. was not warranted by the evidence, nor was there any support for the alternate mandatory verdict of 6¼¢. There was a vast quantity of evidence, both medical and lay, that Edith Polando had sustained serious physical injuries as the result of the bus collision and, regardless of the cause of death more than four years later, she, and then her estate, was entitled to a recovery for these injuries if they were caused by the negligence of the defendant company.

Two juries have now found that the defendant company was negligent and we are satisfied that there is adequate credible evidence to support that verdict. In his charge to the jury the Trial Judge said: "The law of Pennsylvania known as the Motor Vehicle Code, provides in part: 'Upon all highways of sufficient width, except for one-way streets, the driver of a vehicle shall drive the same upon the right half of the highway, except when overtaking and passing another vehicle.'

"And further: 'The driver of a vehicle shall not drive to the left side of the center line of a highway

in overtaking or passing another vehicle proceeding in the same direction, unless such left side is clearily visible, and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking or passing to be made in safety.' "

This, of course, is a correct statement of the law and the jury dutifully assumed the responsibility of determining from the testimony whether the left side was "clearly visible" and "free of oncoming traffic for a sufficient distance ahead to permit" the bus to make the "passing . . . in safety."

Nucci Ross was the owner and driver of the car which the bus passed as it approached the Vance Mills crossing. He testified that the bus sped by him with such velocity that it "shook" him. Asked for his judgment as to the speed in miles per hour, he replied: "Well, the way it rocked my car, I would say it was doing 60 or 65."

For a bus laden with human freight to pass a car at night on a two-lane highway at 60 or 65 miles per hour could well, under the circumstances, be regarded as gross negligence, especially when associated with the fact that the bus driver did not assure himself of a clear distance ahead before he committed himself to the always hazardous act of going to the wrong side of the road. In America, travelling on the left side of the road is fundamentally improper. The State permits the occasional use of that lane because of the exigencies of travel but authorizes it only with the understanding that one will enter that hazardous territory with his eyes on the road, his mind on the job, and his hands and feet prompt to execute a safe maneuver over a course already formulated. Anything less than such conduct is blameworthy.

In this case the bus driver entered into the imperilling lane without the caution which the physical facts

of the highway so obviously demanded. The defendant's counsel in his brief concedes that the bus driver "commenced to pass the Ross car while proceeding in the same direction 800 feet from a curve in the road at which curve there is also an intersection." Could the bus negotiate the passage before reaching the Vance Mills crossing, at which point a car could appear from the intersecting road? Could the bus successfully pass the car before the arrival of some other car potentially on the far side of the curve, and the sudden appearance of which one must always anticipate as a possibility? These were the questions which the bus driver had to put to himself before undertaking to pass the vehicle to his right. Obviously he did not put the questions, or if he did, he ignored the obvious answers.

Anyone today who approaches a curve, which curtains off the traffic on its far side, does so with the knowledge that the next car appearing around that curve may be the wrecking truck to carry him off the highway.

The lower court in its Opinion stated that the proximate cause of the accident was not the bus overtaking the northbound car but the sudden appearance of the Ford which was being negligently operated on the highway. Assuming negligence on the part of the Ford, this did not excuse the bus driver who was on his left side of the highway when a reasonably prudent person would not have been there at the time. Ross testified that the four headlights (two of the overtaking and two of the overtaken northbound cars) flashed in his vision immediately after the bus had passed him. He said it "all happened in a split second, just as he passed me on my left I seen oncoming cars."

Miss Polando testified that the bus driver attempted the passage on a *downgrade* and while the oncoming car was in full view. Since she was sitting in the front

seat of the bus it is to be assumed that the bus driver saw or should have seen everything she saw. She testified: "Q. Where were you when you first saw it [the Ford] approaching? A. Just as we started down that grade; you can see. Q. Was that before or after you— A. Before. Q. —the driver had passed this other car? A. Before. Q. And as you drove—as you passed the other car going in the same direction what did the bus do after it got past the other car? On what part of the road did it travel is what I am getting at? A. It was on the left hand side. Q. How long did he continue on the left hand side of the road? A. Well, not too long because they crashed, the car and the bus."

Further: "Q. And what was the position of the bus on the road when the collision occurred? A. It was on the left hand side of the road. Q. And when the collision occurred would you describe their location for us with regard to each other? A. He was on the left side of the road; he was trying to swing back to his right side, and the other car was trying to get back to their left side when they collided on the left front end, bus and car."

It is to be noted also, as an element of negligence in the case, that the driver divided the attention of watching the road ahead with the pastime of talking to his passenger: "Q. And prior to that time, Miss Polando, had you said anything or done anything? A. Yes, sir, I screamed at the driver 'Oh, my God, you are going to hit that car.' Q. What was the driver doing at that time? A. Looking at me, talking to me."

Edith Polando testified that the bus never did get back over to its right side of Route 51. The collision occurred on the *left* side, the Ford car came to a stop on that *same side of the road,* the bus after travelling 600 feet also came to rest on the *southbound side.* Of course, Eddie Eakle testified that the collision took

place on his (the right side) of the road, but in considering an appeal on a judgment n.o.v. we are required to view the evidence in the light most favorable to the plaintiff, since the jury has already returned a verdict in the plaintiff's behalf.

That the Ford car may have been travelling at a high rate of speed does not excuse the operator of the passenger bus. It was his duty and bounden obligation, entrusted as he was with the lives of 35 people, not to have attempted the passing without such a clear distance ahead that he could complete the maneuver and get back to safety before any other vehicle arrived on the southbound lane. Unless Eakle failed to look ahead (and this would be negligence in itself) he could not help but see the two cars, or at least one of them, in his direct path of travel. When he saw the onrushing headlights it was his duty to remain on the right side of the road or, if he had tentatively ventured out a short distance, to return to the right side. His failure to observe this fundamental rule of the highway and this rudimentary law of safety and self-preservation could only succeed in impressing the jury of a recklessness which easily spells out legal negligence.

The proximate cause of the accident was a question of fact for the jury.

On the retrial of this case the jury will consider not only the question of negligence but the question of damages in the event they find for the plaintiff. At the second trial the learned Trial Judge apparently ascribed to the pathologist who conducted the autopsy a perfection in discernment and an infallibility of judgment that is not of this world. On this pathologist's word alone the Court restricted the jury in its assessment of damages to $6\frac{1}{4}\cent$. The pathologist himself did not claim in his behalf the impeccability of diagnosis and finality of decision the Court attached to his testi-

mony. He testified that the cancerous condition which he found in the autopsy had existed two or three years prior to the decedent's death. Even if we were to accept that statement as incontrovertible, it would still not exclude substantial damages for the plaintiff. Two years prior to Miss Polando's death would be August 13, 1948; three years prior to her death would be August 13, 1947. Edith Polando was injured on March 25, 1946, so that the jury would have the duty at least to determine what damages the estate would be entitled to for one year and five months, or two years and five months. But there is nothing in law or medicine or common experience which declares that the report of one performing an autopsy is irrefutable. The pathologist in question saw Edith Polando for the first time on August 6, 1950, seven days before her death. He did not treat her or prescribe for her. It is for the jury to say whether his findings and opinion based on a dissection of the corpse are to overrule the findings and opinions of all the doctors who treated her for four years and five months, and all the other evidence too, as to her condition following the accident.

Dr. Cornelium M. Mhley, who examined Edith Polando in the Uniontown Hospital in March, 1946, testified that the patient had suffered numerous contusions to her left shoulder, left hip and head; that there were black and blue marks over her body and that she had an injury to her spine. Her head "was drawn over to one side due to the . . . loss of cervical curvature here in her spine. She was bent over and stooped over and she couldn't straighten out." Although there was no fracture to her bone structure, "she had definite injury to her vertebral cartilages and then a tearing of a lot of the fibrous ligaments that join one spine [vertebra] to another spine" [vertebra]. The decedent was a healthy, robust person prior to the

accident. She had never needed medical attention except for an appendectomy. She was a steady worker up to the date of the accident but from that day, March 26, 1946, *she never worked another day.* From March 26, 1946, her life was a painful odyssey of treatment rooms and hospitals. She was treated by at least eight doctors and was in three or four hospitals. She underwent at least two operations and was required to wear a cervical collar and lumbar support. It was not until July 18, 1950, one month prior to her death, that any one found cancer. Dr. Mhley testified to the causal connection between trauma and cancer. The pathologist denied the connection. The pathologist said he found no evidence of deformity or abnormality of any portion of the spine, but Dr. Mhley testified that the limited type of autopsy conducted by the pathologist would not reveal the condition of the spine. He testified as follows: "Q. Doctor, I will ask you whether or not it is possible the [to] examine the spinal column or the vertebra from the chest cavity and determine any diseased condition of the vertebra or the spinal column or the cartilages or ligaments in the neck? A. It is an utter impossibility because the chest cavity ends below the neck and therefore you can't reach, when you are examining, that far; you can't reach up into the neck because you have got the windpipe and you have all these structures in the front here, so you couldn't examine it; and you can't find it in the abdomen cavity. We never palpate for them; we can't find them, the surgeons. Q. Would it be possible to determine the injury to an intervertebral disc in any way other than by dissection of or removing the spinal column and examining of it in that way? A. The operation for a disc is performed by neurosurgeons and orthopedic surgeons, is not through the abdomen or chest cavity but it is always from the outside. Q. That is right. Doctor,

when this patient was sent to the various doctors and to the different hospitals that is a part of the history of this case, was she treated for anything by any of them or any of those places except the injury that she had received on the 26th of March 1946? A. I have sent her to Dr. Heberling, Dr. DeRoy; Dr. Heberling in the Allegheny General Hospital, Dr. DeRoy in the Montefiore Hospital, and in my absence Dr. Bonucci sent her to Dr. Bragdon, at that time *on account of the injuries she received in this accident and for no other reason.* Q. Yes. Now, I will ask you Doctor, whether or not the symptoms and complaints from the patient, and *the injuries received by her on the 26th day of March 1946 persisted to the time of her death?* A. They persisted until I saw her—until I discharged her at the hospital; *they were the same symptoms* except that on her last admission on June 26th at the hospital; from that time on her symptoms were much more exaggerated, and her condition was much more painful, requiring a lot of sedatives in the hospital while she was here to relieve her pain." (Emphasis supplied)

With this categorical contradiction of the pathologist's testimony, it was not for a court to say that the pathologist's testimony was conclusive. His opinion was the opinion of an expert witness but it could not per se cancel out the history of the patient's disabilities which began with the violence to which her body was subjected on March 25, 1946, and never abated until the day of her death.

The full extent of the decedent's injuries resulting from the accident of March 25, 1946, was a question for the jury, taking into consideration all the evidence, both medical and non-medical.

Judgment reversed with a venire facias de novo.